UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | Case No. 08-20573 |
| Plaintiff, | Sean F. Cox |
| vs. | United States District Judge |
| LARRY ARDEL UMPHRYES, | Michael Hluchaniuk |
| | United States Magistrate Judge |
| Defendant. | |

## REPORT AND RECOMMENDATION
## DEFENDANT'S MOTION TO SUPPRESS (Dkt.10)

**I.   PROCEDURAL HISTORY**

Defendant was arrested on March 15, 2008, by state law enforcement authorities following the stop of a vehicle he was a passenger in. He was indicted on November 5, 2008, and charged with a single count of possessing a firearm following a conviction for a felony offense. (Dkt. 1). On December 9, 2009, defendant filed a motion to suppress the evidence seized during the search of his person on March 15, 2009. (Dkt. 10). The government filed its response to the motion on December 17, 2009. (Dkt. 14). An evidentiary hearing was conducted on January 28, 2010. A transcript of the hearing was filed on the court docket. (Dkt. 16). Defendant filed a post-hearing memorandum on February 11, 2010. (Dkt. 18). The government filed a post-hearing brief on February 18, 2010. (Dkt.

19).

## II. RELEVANT FACTS

An evidentiary hearing was conducted on January 28, 2010. The evidence admitted at the hearing produced the following facts relevant to this case. On March 15, 2008, at approximately 10:00 PM, defendant was the passenger in a 2000 Pontiac two-door on DuPont Street near the intersection with Mackin in the City of Flint. (Dkt. 16, 1/28/10 Hrg. Tr. pp. 6-7, 21). Also near that location were Michigan State Police Troopers Swain and Stokes, who were in a single marked State Police vehicle. (Dkt. 16, p. 6). One or both of the troopers observed the driver of the Pontiac commit civil infractions and the vehicle was stopped. (Dkt. 16, pp. 6-9). Trooper Swain approached the driver's side of the vehicle and engaged the driver, ultimately arresting him for driving without an operator's license. (Dkt. 16, p. 9).

Trooper Stokes, a veteran of police work in the Flint area since 1997, approached the passenger side and engaged the passenger, subsequently identified as defendant. (Dkt. 16, pp. 4, 9-10). Trooper Stokes asked for identification and was given a "generic" name by defendant which apparently caused Trooper Stokes to be suspicious. In the experience of Trooper Stokes, giving a "generic" name is something people typically do when they "are lying about their identity." (Dkt. 16, p. 10). Defendant was also "clenching" his right side with his arm, which Trooper

Stokes believed was "typical for someone that's hiding either contraband or a weapon." and was "extremely" nervous. (Dkt. 16, p. 10). Trooper Stokes observed defendant light a cigar by holding his right elbow "pinned against his side" and dropping his head down to his right hand rather than the more normal manner of lifting his right hand up to his mouth. (Dkt. 16, p. 10).

The training Trooper Stokes had received indicated that when people carry weapons they "favor" the side of the body where the weapon is and "keep contact on that weapon so that they know where it is and the motions that [defendant] was displaying led [Stokes] to believe that [defendant] may [have been] armed." (Dkt. 16, p. 12). These events played out in a section of Flint that Trooper Stokes considered a "high crime area." *Id*.

Trooper Stokes observed defendant's hand was shaking and he continued to keep his elbow "against his side." (Dkt. 16, p. 13). A decision was made to search the vehicle following the arrest of the driver and based on the intended search defendant was asked to step out of the vehicle. *Id*. Trooper Stokes asked defendant if he had "anything illegal" on him and defendant said he did not. *Id*. Trooper Stokes asked defendant if would "mind" if Stokes patted him down for safety reasons and defendant said "no." (Dkt. 16, p. 14). With defendant facing the vehicle as he was being patted down, Trooper Stokes went directly to the area where defendant had been holding his arm and he found a handgun in defendant's

coat pocket. *Id.*

Without defendant apparently recognizing that a gun had been taken from his coat pocket, Stokes called Trooper Swain to the side of the car where Stokes was with defendant and gave Swain the gun taken from defendant. (Dkt. 16, pp. 14-15). Stokes then attempted to put handcuffs on defendant who reacted to those efforts by elbowing Stokes in the face and running from the scene. *Id.* Stokes shot defendant with a taser but it apparently had no effect due to the coat that defendant was wearing. (Dkt. 16, p. 16). Defendant was arrested later that evening when other officers arrived and found him hiding under a car. *Id.*

While defendant had given the officers a false name, the driver of the vehicle had properly identified defendant to Trooper Swain. (Dkt. 16, p. 17). Upon hearing defendant's name, Trooper Stokes recalled that he had arrested defendant on a prior occasion. Trooper Stokes testified that it is standard operating procedure to identify all the occupants of a vehicle stopped for a traffic offense and to check all occupants of the vehicle for outstanding arrest warrants. *Id.* Consistent with the stated policy, defendant was checked for outstanding arrest warrants and it was determined that there were outstanding warrants for defendant's arrest. (Dkt. 16, p. 18).

On cross-examination Trooper Stokes testified that there were no reports of shootings that he was aware of that evening in the area where the car was stopped.

4

Report and Recommendation
Motion to Suppress
*U.S. v. Umphryes* 08-20573

(Dkt. 16, p. 26). Stokes also testified that the report he prepared following the events of the evening did not include any reference to defendant agreeing to be patted down when he got out of the vehicle. (Dkt. 16, p. 28). Stokes said he asked everyone who is stopped for a traffic offense, and gets out of the vehicle, if they mind being patted down. (Dkt. 16, p. 29). He also said it is his policy to hold everyone that is stopped in this fashion until their name can be checked for outstanding warrants. (Dkt. 16, pp. 30-31).

On re-direct, Trooper Stokes stated he had been asked by Genesee County officials to document why he asks people for their consent to search them when they are stopped for a traffic violation and step out of the car. He further stated that his report regarding the present situation with defendant did include the reasons he asked for defendant's consent to search but did not include the fact that defendant gave consent because Stokes asks "everyone" as a matter of routine policy for consent to a pat down search. (Dkt. 16, p. 33).

Trooper Stokes was the only witness called by either side during the evidentiary hearing. (Dkt. 16, p. 35).

5

Report and Recommendation
Motion to Suppress
U.S. v. Umphryes 08-20573

## III. ANALYSIS AND CONCLUSIONS

Defendant's motion to suppress the firearm seized from him on March 15, 2008, was based on the initial claim that the search violated defendant's Fourth Amendment rights. ( Dkt. 10, pp. 4-5). The government initially responded by arguing that the officer conducting the search that produced the firearm had a justifiable fear that defendant was armed and therefore the search of defendant did not violate the Fourth Amendment, citing *Terry v. Ohio*, 392 U.S. 1 (1968). (Dkt. 14, pp. 2-3).

The government supplemented its initial argument regarding the seizure of the evidence by contending that even if there had not been a justification for the pat-down search of defendant, the firearm would have inevitably been discovered because defendant had outstanding warrants at the time of these events and he would have been arrested on those warrants when the officers checked the LEIN system, which they did as a matter of routine practice, and found the warrants. Once arrested defendant would have been searched and the firearm would have been found at that time. (Dkt. 15).

Following the hearing, defendant filed a memorandum in which he argued that (1) there was no reasonable suspicion that he was a risk to the officers and therefore he should not have been frisked, (2) the doctrine of inevitable discovery should not apply to these circumstances because, had the officers not conducted a

search of his person they would have had no basis to continue to detain him long enough to determine that arrest warrants were outstanding, and (3) the government had not proved that defendant consented to a search of his person and that, if consent was given, the government had not proved it was voluntary. (Dkt. 18).

The government's response to defendant's post-hearing memorandum argued that (1) when all the factors were considered, including the defendant holding his arm against his side, conduct the government describes as a furtive gesture, there was a proper basis for Trooper Stokes to have a reasonable suspicion that defendant posed a danger, (2) a preponderance of the evidence established that defendant would have been identified and the officers would have learned about the arrest warrants leading to the seizure of the firearm, and (3) Trooper Stokes testified that defendant consented to the search and there is no evidence of coercion. (Dkt. 19).

Defendant does not take issue with the stop of the car he was riding in on March 15, 2008, for traffic offenses. Once a vehicle is stopped for a traffic offense the driver and all the passengers are "seized" for the duration of the traffic stop. *Brendlin v. California*, 551 U.S. 249, 255 (2007). The driver of a car stopped for a traffic offense, or a passenger in the same vehicle, can be asked to step from the vehicle for the purpose of conducting a pat-down search where the police officer has a reasonable suspicion that the person subjected to the search is armed and

dangerous. *Arizona v. Johnson*, 129 S.Ct. 781, 784 (2009).

The existence of reasonable suspicion depends on the totality of the circumstances. *United States v. Martin*, 289 F.3d 392, 397 (6th Cir. 2002). In evaluating whether the totality of the circumstances supports the determination that reasonable suspicion exists, a court must allow the officers involved in the event to draw upon their experience and training and the court should give due weight to the inferences drawn by the officers. *United States v. Arvizu*, 534 U.S. 266, 273 (2002). However, that is not to say that an "ill-defined hunch" by a police officer will suffice. The inferences drawn must have a "particularized and objective basis." *United States v. Richardson*, 385 F.3d 625, 630 (6th Cir. 2004).

<u>Reasonable Suspicion</u>

The government maintains that Trooper Stokes had a reasonable suspicion that defendant was armed and that reasonable suspicion justified the pat-down search of defendant which resulted in the seizure of a firearm from defendant's person. The facts supporting the claim of reasonable suspicion included (1) defendant's use of what was perceived as a false name, (2) defendant's extreme nervousness, (3) defendant's unusual use of his arm, and (4) the events taking place in a "high crime" area. These facts are to be considered in their totality, rather than separately, although they must be examined one at a time in order to consider the weight attributed to all the factors. The false name factor did not

appear to be based on much beyond a hunch of Trooper Stokes. Defendant gave the name of "Timothy Johnson" which Trooper Stokes described as being a "generic" or common name. Based on some unarticulated aspect of his experience Trooper Stokes believed that to be a false name. While the hunch of Trooper Stokes turned out to be accurate, as of the time of the pat-down it was only a hunch and therefore did not add much to the reasonable suspicion question. Defendant's extreme nervousness and the fact that the events took place in a high crime area are not strong factors but can be considered in evaluating the totality of the circumstances. *United States v. Campbell*, 549 F.3d 364, 371 (6th Cir. 2008) (high crime area by itself not enough to support reasonable suspicion but can be considered with other factors); *United States v. Wilson* 506 F.3d 488, 495-96 (6th Cir. 2007)(extreme nervousness, standing alone, not sufficient for a *Terry* stop but is one of "several grounds" relevant to reasonable suspicion). The single most important factor in the present case is the conduct of defendant regarding holding his right arm against his side throughout the sequence of events. Trooper Stokes testified that in his experience this sort of conduct was regularly associated with concealing weapons or other contraband. These actions, of the kind frequently described as furtive gestures, were sufficiently objective and particularized such that Trooper Stokes could reasonably have believed that defendant was concealing a weapon. "Furtive movements made in response to a police presence may also

properly contribute to an officer's suspicions." *United States v. Caruthers*, 458 F.3d 459, 466-67 (6th Cir. 2006)("bending or leaning," "arm movements" that could be an attempt to conceal or "unusual posture" examples of furtive conduct). The totality of these factors justified Trooper Stokes belief that reasonable suspicion existed that defendant was armed and dangerous. Perhaps individually they might not have crossed that threshold, but factors that seem benign when considered separately might establish reasonable suspicion when viewed collectively. *United States v. Perez*, 440 F.3d 363, 371 (6th Cir. 2006).

Inevitable Discovery

The government also contends that even if there had not been reasonable suspicion the firearm would have inevitably been discovered because defendant would have been identified, arrested and searched. Although defendant gave the officers what turned out to be a false name, the driver of the vehicle gave the officer defendant's true name. That name was checked in the LEIN system and arrest warrants for defendant were located. "If the prosecution can establish by a preponderance of the evidence that the information ultimately or inevitably would have been discovered by lawful means ... then the deterrence rationale has so little basis that the evidence should be received." *Nix v. Williams*. 467 U.S. 431, 444 (1984). "The inevitable discovery doctrine 'requires the district court to determine, viewing affairs as they existed at the instant before the unlawful search, what

would have happened had the unlawful search never occurred.'" *United States v. Alexander*, 540 F.3d 494, 502 (6th Cir. 2008), quoting from *United States v. Kennedy*, 61 F.3d 494, 499 (6th Cir. 1995).

Defendant objects to the application of the inevitable discovery doctrine under these circumstances claiming any detention of defendant "until a name has been determined and a check has been made is not lawful" and, because the alternate investigative procedure must be lawful, inevitable discovery does not apply. (Dkt. 18, pp. 3-4). While defendant's argument does have some hypothetical merit, the facts of this case do not demonstrate that any delay beyond the normal processing of the traffic stop, the resulting arrest of the driver and the search of the vehicle would have taken place. There is no reason to assume that the process of identifying defendant, checking his name for warrants and arresting him on those warrants would have involved any lengthy delay. As indicated earlier, a passenger in a vehicle stopped for a traffic offense is reasonably "seized" for the duration of the traffic stop. *Brendlin*. 551 U.S. at 255. "Normally the stop ends when the police have no further need to control the scene." *Arizona v. Johnson*, 129 S.Ct. 781, 788 (2009). Officers have the discretion to ask a person stopped for a traffic offense "a moderate number of questions to determine [the person's] identity" and may lawfully detain a person stopped until record checks are completed. *Campbell*. 549 F.3d at 372-73. The present case has several

similarities to *United States v. Ellis*, 497 F.3d 606 (6th Cir. 2007) where a traffic stop was extended by several minutes when the passenger gave one of the officers involved in the traffic stop a false name and that required the officer to make additional inquiries subsequently determining the actual identify of the defendant. The factors in *Ellis* justifying the extension of the traffic stop included the need to verify the passenger's name. The record in the present case does not show how long it would have taken to identify defendant and check his name for arrest warrants had the pat-down search not been conducted. However, there is no reason to believe that it would have taken any longer than the duration of the existing traffic stop extended by the circumstances that resulted after the stop was made. The driver of the vehicle apparently identified defendant fairly quickly in the sequence of events and no evidence suggests checking defendant's name would have taken an inordinate amount of time. Any delay occasioned by defendant's use of a false name would have been justified under the circumstances. The application of the inevitable discovery doctrine inherently calls for a degree of speculation regarding how things might have happened had the search not taken place. In these circumstances, the government has established by a preponderance of the evidence that, had the pat-down search not taken place as it did, defendant would have been properly identified, he would have been checked for warrants, the warrants would have been found and he would have been arrested. The firearm

seized from his coat pocket would have been found during the search incident to the arrest of defendant.

## Consent

A third argument made by the government supporting the legitimacy of the search is the claim that defendant consented to the search of his person. Factually, Trooper Stokes testified that when defendant was directed to step out of the car because it was going to be searched, he asked defendant if he "minded" if he was patted-down for officer safety. Trooper Stokes testified that defendant responded "no" to his question. (Dkt. 16, p. 14).

The government bears the burden of proving consent that was "voluntary, unequivocal, specific, intelligently given, and uncontaminated by duress or coercion." *United States v. Canipe*, 569 F.3d 597, 602 (6th Cir. 2009). Defendant argues that there is a question whether consent was given due to the fact that Trooper Stokes' report regarding the incident does not state that consent was given and that, assuming defendant did agree to the search, the consent of defendant was not voluntary due to the nature of the circumstances including the fact that defendant was ordered from the car, directed to put his hands over his head and Trooper Stokes grabbed defendant's fingers. (Dkt. 18, pp. 5-6). The government argues that Trooper Stokes' testimony that defendant consented to the search is "uncontradicted." (Dkt. 19, p. 8).

The government is correct that Trooper Stokes' testimony was uncontradicted in the sense that no other witness testified that the consent was not given.  However, the undersigned views the failure of any reference to defendant consenting to a search to be included in Trooper Stokes' report is in contradiction to his testimony in that regard.  Every experienced police officer, like Trooper Stokes, knows that the seizure of evidence is frequently challenged and therefore the circumstances surrounding the act of seizing evidence is a significant issue.  Whether a person "consents" to a search is an extremely critical question in evaluating the propriety of police conduct.  Failing to include something as important as "consent" in a report is contradictory to consent having been given.

Compounding the uncertainty of the issue is the explanation offered by Trooper Stokes when he was asked about the absence of information in the report regarding consent.  He stated, in essence, that he asks for consent from everyone that he asks to step out of the vehicle,  in response to a question about why that information was not in the report. (Dkt. 16, p. 29).  On re-direct he elaborated on that explanation by stating "[i]n Genesee County they request – I seek consent to search persons when they step out of a vehicle for my safety.  And Genesee County requests that we document in our report why.  So since I ask everybody in this report I documented why I was asking for the consent which is why I didn't place in there that I had actually spoke to him about consent." (Dkt. 16, p. 33).  It seems

illogical to give reasons for asking for consent but not include the fact that consent was given. Consent need not be predicated on "reasons" although a pat-down search certainly does. Stating reasons why a pat-down search was done makes sense but stating reasons why consent is requested does not. The report of Trooper Stokes was not offered as evidence in the case and therefore the evidence relating to this issue is limited to the testimony offered at the hearing.

Another factor relevant to determining whether the government has proved a knowing and voluntary consent is the manner in which the consent was allegedly given. Trooper Stokes testified that defendant was ordered from the car because a search of the car was going to be conducted. (Dkt. 16, p. 13). Before he got out of the car, defendant was told to place his hands behind his head and interlock his fingers. Trooper Stokes grabbed defendant's fingers, which were positioned as instructed, while defendant was getting out of the car. Trooper Stokes also testified that it was "as [defendant was] stepping out" of the car that consent to the pat-down search was requested. (Dkt. 16, pp. 28-29). Given the circumstances during which these events were taking place, including the fact that Trooper Stokes had ordered defendant from the car and had exerted physical control of

defendant by grabbing his fingers which were placed on defendant's head,[1] as well as the confusing nature of the report subsequently prepared by Trooper Stokes and his testimony in that regard at the hearing, the undersigned concludes that the government has not met its burden to show a knowing and voluntary consent to the pat-down search.

## IV.   RECOMMENDATION

For the above reasons, it is **RECOMMENDED** that defendant's motion to suppress be **DENIED**.

The parties to this action may object to and seek review of this Report and Recommendation, but are required to file any objections within 14 days of service, as provided for in Federal Rule of Civil Procedure 72(b)(2). Failure to file specific objections constitutes a waiver of any further right of appeal. *Thomas v. Arn*, 474 U.S. 140 (1985); *Howard v. Sec'y of Health and Human Servs.*, 932 F.2d 505 (6th Cir. 1981). Filing objections that raise some issues but fail to raise others with specificity will not preserve all the objections a party might have to this Report and Recommendation. *Willis v. Sec'y of Health and Human Servs.*, 931 F.2d 390, 401 (6th Cir. 1991); *Smith v. Detroit Fed'n of Teachers Local 231*, 829 F.2d 1370,

---

[1] The undersigned does not intend to suggest that the steps employed by Trooper Stokes were improper under the circumstances but only that they might have had a bearing on the voluntariness of any statement made by defendant at that time.

1373 (6th Cir. 1987). Pursuant to Local Rule 72.1(d)(2), any objections must be served on this Magistrate Judge.

Any objections must be labeled as "Objection No. 1," "Objection No. 2," etc. Any objection must recite precisely the provision of this Report and Recommendation to which it pertains. Not later than 14 days after service of an objection, the opposing party may file a concise response proportionate to the objections in length and complexity. Fed.R.Civ.P. 72(b)(2), Administrative Order 09-AO-042. The response must specifically address each issue raised in the objections, in the same order, and labeled as "Response to Objection No. 1," "Response to Objection No. 2," etc. If the Court determines that any objections are without merit, it may rule without awaiting the response.

|  |  |
|---|---|
| Date: March 19, 2010 | s/Michael Hluchaniuk<br>Michael Hluchaniuk<br>United States Magistrate Judge |

# CERTIFICATE OF SERVICE

I certify that on March 19, 2010, I electronically filed the foregoing paper with the Clerk of the Court using the ECF system, which will send electronic notification to the following: Robert W. Haviland, AUSA, and Kenneth R. Sasse.

<pre>
                                    s/Tammy Hallwood
                                    Tammy Hallwood
                                    Case Manager
                                    U.S. District Court
                                    600 Church Street
                                    Flint, MI 48502
                                    (810) 341-7850
                                    tammy_hallwood@mied.uscourts.gov
</pre>